UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARINA SOLIMAN,
    *Plaintiff*,

v.

SUBWAY FRANCHISEE ADVERTISING
FUND TRUST LTD. *et al.*,
    *Defendants*.

No. 3:19-cv-00592 (JAM)

**ORDER DENYING MOTION TO COMPEL ARBITRATION**

Plaintiff Marina Soliman wanted a good deal on a Subway sandwich. In response to a Subway ad, she sent a text message to Subway in order to receive price discounts by means of promotional texts. Moments later she received a coupon for a free 6-inch sub with the regular purchase of a large drink. But the texts kept coming, even after Soliman tried to opt out of receiving any more.

Soliman ended up filing this federal class action lawsuit alleging that Subway's unwanted text messages violated the federal Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.* Subway responded by moving to compel arbitration. Subway says that when Soliman signed up for discount sandwiches, she also agreed to a side order of arbitration. I don't think so. Because Subway did not provide reasonably conspicuous notice to Soliman that she was agreeing to arbitration and because Subway has not shown that Soliman unambiguously assented to arbitration, I will deny Subway's motion to compel arbitration.

**BACKGROUND**

The defendant Subway Franchisee Advertising Fund Trust Ltd. ("Subway") is a Connecticut company affiliated with the well-known chain of sandwich shops with thousands of

1

locations around the world. In 2016, Subway ran a "call to action" marketing campaign in which consumers were invited to opt in to receive sales promotions via text message by texting a keyword to the short code 782929. Doc. #15-4 at 1-2 (¶¶ 2-3). The campaign was communicated to consumers through print and digital advertisements consisting mostly of the offer, but also containing a roughly 100-word, small-font black-on-white disclaimer stating in part, "Terms and conditions at subway.com/subwayroot/TermsOfUse.aspx," and "[t]o opt-out, text STOP to 782929." *Id.* at 2-3 (¶¶ 2-3). The notice of the terms was cabined on the left by the phrase, "Consent not required to buy goods/svcs," and on the right by notice of a privacy policy located at a different URL. *Ibid.*



The terms of use on Subway's website, to which the advertisement pointed, consisted of many screens of fine print. At the top of the webpage, Subway instructed end-users in small but bold print to "PLEASE CAREFULLY REVIEW THESE TERMS OF USE *FOR THIS WEBSITE*." Doc. #15-2 at 4 (emphasis added). Also at the top of the webpage was a table of contents that appeared to hyperlink to the terms' various sections so that users would not have to

scroll down to reach any particular one. *Ibid.* What would have been several screens down the webpage on most computer screens was section 14, an arbitration clause with the header, "Choice of Law & Dispute Resolution." *Id.* at 7-8.

Soliman was a college student residing in California. Docs. #1 at 2 (¶ 5), #19 at 5. One day in April 2016 while Soliman was standing in line at a Subway store in California, "an employee pointed out a promotion where [Soliman] could receive a free sub sandwich if [she] texted Subway to a specific number." Doc. #19-1 at 3 (¶ 7). Soliman texted "Subway" to 782929 and within seconds received a text message in response stating, "Reply w/ur ZIPCODE as ur sig 2agree 2 SUBWAY offers (max10msgs/mo-Msgs may b autodialed-Consent not req'd 2buy goods/svcs) Reply HELP=help Msg&data rates apply." Doc. #15-3 at 2-3 (¶¶ 5-6).

Soliman completed this "double opt-in" process one minute later by replying with her Los Angeles zip code. *Id.* at 3 (¶ 6). Within seconds, she received a confirmatory text message in response stating, "Thanks for joining the LA area SOCALOFFERS SUBWAY Text Club! Help? Txt HELP, Stop? Txt STOP or 8447887525 Msg&data rates may apply." *Id.* at 3 (¶ 7). One minute later, she received a hyperlinked coupon for a "free 6 inch Classic sub" stating, "To access your coupon for a free 6 inch Classic sub with purchase of a 30oz drink, click link. http://ssms.io/sg8c3t9s6vp." *Ibid.*

Soliman was not informed orally that she was entering into a contract by texting the short code, nor was she provided with a copy of any "terms and conditions"; she did not sign anything or click on a webpage saying she agreed to any "terms and conditions." Doc. #19-1 at 3-4 (¶¶ 7, 11). She does not believe she saw an advertisement about the campaign when she opted in, but if she did, it would have been an in-store print advertisement. *Id.* at 4 (¶ 10). I assume solely for

purposes of ruling on this motion that the advertisement copied above was the promotion "pointed out" by the employee and that Soliman saw it. Doc. #15-4 at 2-3 (¶ 3).

In December 2016, Soliman opted out of Subway's text-based promotions by texting "Stop" to 782929, and she received a same-day confirmation stating, "Subway: You have been unsubscribed from all programs on 782929 and will no longer receive any text alerts. Q's? Reply HELP. Msg & data rates may apply." Doc. #19-1 at 1-2 (¶ 5). But due to a malfunction with Subway's opt-out technology, Soliman received another promotional text message four days later. *Ibid.*

In April 2019, Soliman filed a class action complaint alleging that Subway's failure to honor her opt-out request violated various sections of the TCPA. Doc. #1. Subway has moved to compel arbitration, alleging in relevant part that Soliman agreed to the arbitration clause on its website by opting in to its promotional campaign. Doc. #15-1. Soliman responds in part that she did not agree to arbitrate any claims with Subway. Doc. #19.

## DISCUSSION

The Federal Arbitration Act of 1925 provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Act "reflects 'a liberal federal policy favoring arbitration agreements,'" although "parties are not required to arbitrate unless they have agreed to do so." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011)). Accordingly, when a party seeks to compel arbitration, a court "must first determine whether such [an arbitration] agreement exists between the parties." *Ibid.*

Whether the parties have agreed to arbitrate is a question of state contract law. *Id.* at 73-74. "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019).

Here, the parties agree that California law applies. Doc. #19 at 17 n.4; Doc. #20 at 3 n.2. And under California law (as recently interpreted by the Second Circuit in the arbitration context), a contract is validly formed if there is (1) "reasonably conspicuous notice of the existence of contract terms," and (2) "unambiguous manifestation of assent to those terms." *Meyer*, 868 F.3d at 75. I will consider both of these requirements in turn.[1]

### *Reasonably conspicuous notice*

An offeree has reasonably conspicuous notice of contract terms if a reasonable person in her position "would have known about the terms and the conduct that would be required to assent to them," as well as the fact that by engaging in such conduct, "she is taking such goods or employing such services subject to additional terms and conditions that may one day affect [] her." *Id.* at 77-78 (internal quotations and citations omitted). "Where an offeree does not have actual notice of certain contract terms, [she] is nevertheless bound by such terms if [she] is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Starke*, 913 F.3d at 289.

"In the context of web-based contracts, we look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in [a] way that would put her on inquiry notice of such terms." *Ibid.* As one court has observed, "[t]he more the . . .

---

[1] In deciding a motion to compel arbitration, "courts apply a standard similar to that applicable for a motion for summary judgment." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (internal quotations and citation omitted).

design diverges from [a] basic layout—such as by placing the notice further away from the action button, cluttering the screen with potentially distracting content, or omitting the language explicitly saying that by performing the action the user agrees to be bound by the terms—the less likely courts are to find that inquiry notice has been provided." *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 266 (E.D.N.Y. 2019).

In light of this framework, I find that the "reasonably conspicuous notice" requirement is not satisfied here. A reasonably prudent consumer in Soliman's shoes would not have known about the arbitration clause and would not have understood that the offer was conditioned on her acceptance of it. Indeed, Subway created multiple obstacles to obstruct the offeree-consumer's ability to understand that her acceptance of the promotional offer was also her acceptance of an agreement to arbitrate.

First, the consumer would have to have been aware of and capable of reading the plain, small-print disclaimer in the advertisement, which is dwarfed by the surrounding colorful text and imagery and which references terms and conditions only at the end of the second line. Second, if the consumer happened to read the notice, she would have to have inferred that the vague reference to terms and conditions applied to the promotional offer, notwithstanding the immediately preceding language that "[c]onsent not required to buy goods/svcs."

Third, after discovering the notice and determining it might bind her if she accepts the offer, the consumer would have to have typed each character of the tiny URL—which spills over from the second into the third line of the disclaimer—into a web browser on her smartphone, typo-free and in a Subway store with decent cell or internet service, or else recorded the URL and accessed it elsewhere. Fourth, the consumer would have to have ignored the bold, all-caps descriptor at the top of the linked webpage which states that the terms are "FOR THIS

6

WEBSITE," suggesting by implication that they do not apply to the promotional offer at hand but rather to her use of Subway's website. Fifth, the consumer would have to have jumped (via hyperlink) or scrolled several screens down just to find the arbitration clause. All these obstacles dispel any conclusion that the arbitration clause was reasonably conspicuous.

The first obstacle alone deprives the notice of reasonable conspicuousness. For example, in *Burks v. Kaiser Found. Health Plan, Inc.*, 73 Cal. Rptr. 3d 257 (Cal. Ct. App. 2008), the California Court of Appeal invalidated an arbitration clause at the bottom of a one-page health insurance enrollment form. "Given the plain, small typeface [the defendant] used for its arbitration disclosure without any heading, and given that most of the rest of the form . . . contains larger typeface, some of which is bold and some of which is highlighted by a different colored background," the court held "that the disclosure is not 'prominently displayed' on the enrollment form, notwithstanding its placement as the only text immediately above the signature line on the form." *Id.* at 262; *see also id.* at 258-60 (noting "prominent" is synonymous with "conspicuous," and finding the disclosure could not "be reasonably expected to command the notice of a person filling out the form").

In light of the Subway advertisement's design, which appears actively to draw attention away from the notice, the fact that the notice was arguably proximate to the offer is not enough to presume consumer awareness. *Cf. Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016) ("Proximity to the top of a webpage does not necessarily make something more likely to be read in the context of an elaborate webpage design," such as where "[t]here are numerous other links on the webpage, in several different colors, fonts, and locations, which generally obscure the message").

Even if a reasonable consumer would have become aware of the notice, it is doubtful she would have "connect[ed] the contractual terms to the services to which they apply." *Meyer*, 868 F.3d at 78. The notice, which simply states, "Terms and conditions at [URL]," could hardly be more vague, and the preceding "[c]onsent not required" language as well as the website header that the terms are "FOR THIS WEBSITE," are altogether misleading. *Cf. Samsung Elecs. Am., Inc. v. Ramirez*, 777 F. App'x 243, 244 (9th Cir. 2019) (finding "the inaptly titled booklet containing the terms and conditions and the smartphone packaging's vague reference to terms and conditions are insufficient to put a reasonable consumer . . . on notice of the arbitration provision" therein).[2]

Proximity without more, such as an express statement linking acceptance of the terms to the offer, is insufficient to presume awareness of the terms' applicability. As one federal appeals court has noted, "proximity or conspicuousness of [a] hyperlink alone is not enough to give rise to constructive notice," barring perhaps an additional admonition to "[r]eview terms," and "consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Cf. Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1178-79 (9th Cir. 2014); *see also Lopez v. Terra's Kitchen, LLC*, 331 F. Supp. 3d 1092, 1101 (S.D. Cal. 2018) (noting that "the proximity of the hyperlink in green typeface to the 'place order' button, without affirmative acknowledgment of the agreement before proceeding with the purchase . . . is not enough to give rise to inquiry notice").

Although a reasonable consumer might know in this context that searching the URL in a web browser would lead to the terms and conditions noticed in the disclaimer, she would not

---

[2] Subway faults Soliman's use of non-binding authority such as this, Doc. #23 at 5, but Fed. R. App. P. 32.1 permits the citation, and indeed the Ninth Circuit's own rules do, *see* 9th Cir. R. 36-3(b). Subway itself also cites out-of-circuit case law and/or case law that does not apply California law, but I have considered those opinions for whatever persuasive value they offer here.

necessarily expect to be bound by them. *See Arnaud v. Doctor's Assocs. Inc.*, 2019 WL 4279268, at *6 n.6 (E.D.N.Y. 2019) (applying New York law of contract formation, which is substantially similar to California law). Thus, "the problem with merely displaying a hyperlink in a prominent or conspicuous place is that, without notifying consumers that the linked page contains binding contractual terms, the phrase 'terms of use' may have no meaning or a different meaning to a large segment of the Internet-using public." *Long v. Provide Commerce, Inc.*, 200 Cal. Rptr. 3d 117, 126-27 (Cal. Ct. App. 2016).

Subway cites several cases in response to these arguments, all of which are readily distinguishable or otherwise support Soliman's position. For example, Subway cites *Meyer* for the proposition that a notice of terms that is "in plain view" and "in close proximity" to the offer is sufficient. Doc. #15-1 at 11. But in *Meyer*, the notice was a "blue and underlined" hyperlink, was "directly adjacent to the button intended to manifest assent to the terms," was uncluttered by other verbiage, and expressly stated that "[b]y creating an account" (by clicking the "register" icon) the user "agree[d] to the TERMS OF SERVICE." 868 F.3d at 78 (distinguishing *Nicosia*, 834 F.3d 220). Here, by contrast, the notice was sandwiched (so to speak) between roughly 100 words of small black text compared to which it was unimpressive, was tucked away at the bottom corner of the advertisement relatively distant from the offer, and contained no express language explaining that by accepting the offer, a consumer was agreeing to be bound by the terms.

In *Starke v. SquareTrade, Inc.*, *supra*, the Second Circuit distinguished *Meyer* on similar grounds, noting that in *Starke* "the interface here is cluttered with diverse text, displayed in multiple colors, sizes and fonts, and features various buttons and promotional advertisements that distract the reader from the relevant hyperlink," and noting that the offer email "in no way

signals to Starke that he should click on the link, and it does not advise him that he would be deemed to agree to the contract terms in the document to be found by clicking that link," and also noting that "[t]he 'Terms & Conditions' hyperlink was spatially decoupled from the transaction because it was not provided near the portion of the Amazon purchase page actually requiring Starke's attention . . . ." 913 F.3d at 293-94. This case is much more like *Starke* than *Meyer*.

Subway similarly misplaces its reliance on *Greenberg v. Doctors Associates, Inc.*, 338 F. Supp. 3d 1280 (S.D. Fla. 2018), a case that also involved a Subway promotional campaign. There, however, the disclaimer explicitly required users' affirmative consent—something missing here. *See id.* at 1282-83 ("By clicking 'Sign Me Up' you agree to receive email promotions and other general email messages from Subway Group, in addition you agree to the Subway Group Privacy Statement and Terms of Use").

Subway also relies on *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7 (2d Cir. 1995), a case in which the Second Circuit found that a cruise ticket reasonably communicated the existence of a forum-selection clause found in the attached contract because "[t]he warning 'IMPORTANT NOTICE—READ BEFORE ACCEPTING' is found in bold, capitalized, medium-sized lettering on the face of the ticket." *Id.* at 9. There was no such warning by Subway here.

Nor is this case analogous to *Winner v. Kohl's Dep't Stores, Inc.*, 2017 WL 3535038 (E.D. Pa. 2017). There, the issue was whether the plaintiff consented even to receive text messages from Kohl's, not whether she was bound by the terms and conditions of any offers accepted. Consequently, the district court applied FCC rules defining the term "prior express written consent" as it is used in the TCPA, as opposed to state law on contract formation, let alone the law of California. *Id.* at *5-*6.

10

The other cases that Subway relies on are equally unavailing. In *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991), the Supreme Court explicitly did not reach the issue of whether the consumers had notice of the forum-selection clause on the back of their cruise tickets, because they "essentially have conceded that they had notice of [it]." *Id.* at 590.

Similarly in *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004), the defendant admitted that it "visited Register's computers daily to access WHOIS data and each day saw the terms of Register's offer" and "that, in entering Register's computers to get the data, it was fully aware of the terms on which Register offered the access." *Id.* at 402. The court noted that the defendant's argument that it was not bound by the terms because they were only provided to it after it obtained the data "might well be persuasive if its queries addressed to Register's computers had been sporadic and infrequent," such as if it "submitted only one inquiry." *Id.* at 401.

Finally in *Ferrie v. DirecTV, LLC*, 2016 WL 183474 (D. Conn. 2016), Judge Hall found extensive evidence that the plaintiff had notice of the arbitration agreement, including the following written "at the very top" of the Customer Agreement referenced in a confirmation email after purchase: "THIS DESCRIBES THE TERMS AND CONDITIONS OF YOUR RECEIPT OF AND PAYMENT FOR DIRECTV SERVICE AND IS SUBJECT TO ARBITRATION (SECTION 9) . . . . IF YOU DO NOT ACCEPT THESE TERMS, PLEASE NOTIFY US IMMEDIATELY AND WE WILL CANCEL YOUR ORDER OR SERVICE . . . . IF YOU INSTEAD DECIDE TO RECEIVE OUR SERVICE, IT WILL MEAN THAT YOU ACCEPT THESE TERMS AND THEY WILL BE LEGALLY BINDING." *Id.* at *7. The email itself "inform[ed] the reader, very clearly and at the outset . . . that the email contain[ed] important contractual information," advising customers to review the "Customer Agreement,"

which was hyperlinked. *Ibid.* Before the purchase, DIRECTV orally informed the plaintiff that, by signing up for paperless billing, he would be agreeing to receive billing information via email that a reasonable person in his position would have found important to review. *Id.* at *10. Finally, before contacting DIRECTV, the plaintiff averred that he had "looked at" its advertisements online, and DIRECTV produced evidence that those advertisements contained a disclosure that stated, "Receipt of DIRECTV programming subject to DIRECTV Customer Agreement; copy provided at directv.com/legal and in order confirmation," and in which the "Customer Agreement" was hyperlinked. *Id.* at *11. Thus, the facts in *Ferrie* reflect far greater notice and clarity about the consequences of agreeing to the offer than the facts before me here.

In short, I conclude that Soliman did not receive reasonably conspicuous notice of the arbitration agreement. Even under the assumption that Soliman saw the advertisement above, which is disputed, a reasonably prudent consumer would not have had inquiry notice of the arbitration clause on Subway's website. Accordingly, for lack of reasonably conspicuous notice of the arbitration agreement, I cannot conclude that Soliman agreed to arbitration.

### *Unambiguous manifestation of assent*

Next I consider whether Soliman unambiguously manifested her assent to arbitration. "California contract law measures assent by an objective standard that takes into account both what the offeree said, wrote, or did and the transactional context in which the offeree verbalized or acted." *Meyer*, 868 F.3d at 74 (internal quotations and citation omitted).

It is undisputed that Soliman's double opt-in constituted an unambiguous manifestation of assent to receive sales promotions from Subway via text message, at least until she attempted to opt out. But the question is whether, by that same act of opting in, she manifested no less than *unambiguous* assent *to the arbitration clause*. As Subway correctly notes, it is certainly possible

for a consumer to assent to multiple things at once without rendering the act of assent ambiguous. But for substantially the reasons stated earlier, I find that there is little indication that Soliman assented at all to the arbitration clause. *Cf. Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29-30 (2d Cir. 2002) ("[A] consumer's clicking on a download button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the download button would signify assent to those terms.") (applying California law); *compare Meyer*, 868 F.3d at 80 (finding significant for assent that "the text on the Payment Screen not only included a hyperlink to the Terms of Service, but expressly warned the user that by creating an Uber account, the user was agreeing to be bound by the linked terms").

Nothing from the transactional context in this case suggests otherwise. This was not a one-sided arrangement whereby Soliman received the benefit of a sales promotion and, but for her acceptance of the terms and conditions, would otherwise have incurred no cost and conferred no benefit to Subway. Rather, Soliman agreed to accept possibly annoying text messages from Subway, and Subway presumably expected to receive more sales volume in return.

Soliman did not unambiguously manifest her assent to the arbitration agreement. It follows that there was no agreement to arbitrate, and I need not consider the parties' additional arguments about the scope of the arbitration agreement or whether the arbitration agreement was unconscionable.

## CONCLUSION

For the foregoing reasons, the Court DENIES defendant Subway's motion to compel arbitration (Doc. #15). The parties shall submit a proposed schedule and amended joint Rule 26(f) report by March 19, 2020.

It is so ordered.

Dated at New Haven this 5th day of March 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge