UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARINA SOLIMAN,
   *Plaintiff*,

v.

SUBWAY FRANCHISEE ADVERTISING
FUND TRUST, LTD., *et al.*,
   *Defendants*.

No. 3:19-cv-592 (JAM)

### ORDER GRANTING MOTION TO DISMISS

When plaintiff Marina Soliman received a text message from a Subway sandwich chain offering a free bag of potato chips, she asked to opt out of its advertising. But Subway texted her again anyway. And this time, Soliman did not simply try to opt out; she sued. She now brings a class action complaint against defendant Subway Franchisee Advertising Fund Trust, alleging that its unwanted text messages violated the Telephone Consumer Protection Act.

But however one slices the Act, Subway did not violate it. To win her claims, Soliman must plausibly allege that the text messages either were sent using an automatic telephone dialing system or were sent using an artificial or prerecorded voice. Because she has not done that, I will grant Subway's motion to dismiss.

### BACKGROUND

In 2016, Subway texted Soliman to offer a free bag of potato chips. She replied "STOP" to unsubscribe. Subway responded with an automatic message confirming that she had unsubscribed. But a few days later, it sent her another text message offer.[1] So Soliman, suspecting that others were in the same boat, filed this class action lawsuit. In Count One, she alleges that Subway negligently violated the Telephone Consumer Protection Act by sending her

---

[1] Doc. #57 at 5 (¶¶ 19–22).

1

the second advertisement.[2] In Count Two, she alleges that Subway violated the Act intentionally.[3] Subway has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

## DISCUSSION

The background principles governing a Rule 12(b)(6) motion to dismiss are well established. The Court must accept as true all factual matters alleged in a complaint, although a complaint may not survive unless the facts it recites are enough to state plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014).

The Telephone Consumer Protection Act (TCPA) makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A). The parties appear to agree that a text message is a "call" within the meaning of the TCPA. *See, e.g.*, *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 88–89 & n.1 (2d Cir. 2019). They don't agree whether the text messages that Subway sent used an "automatic telephone dialing system" or an "artificial or prerecorded voice."

### *Automatic telephone dialing system*

The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Although the complaint alleges in conclusory terms that Subway was using "a random or sequential number generator,"

---

[2] *Id.* at 14–15 (¶¶ 73–76).
[3] *Id.* at 15 (¶¶ 77–80).

2

this allegation must be evaluated in light of the additional facts that Soliman claims to be true.[4] The complaint alleges that the numbers selected by Subway for text messages were derived in the first instance from a "stored list of numbers."[5] As Soliman explains in her briefing, an "operator accesses a database of consumer contact information" and then "[t]he operator will load this data set into the dialing platform," at which point "during a process called indexing" a "random or sequential number generator" is used to select which numbers to store and which numbers to produce to the auto-dialer to send text messages.[6] Thus, according to Soliman, "[a] random or sequential number generator is simultaneously used to select and produce the indexed telephone numbers to the dialer," and "[o]nce the number generator corresponds to a matching number in the stored list, that telephone number will be 'produced' from storage to the dialer, which then automatically dials that telephone number."[7]

According to Soliman's own description of Subway's software, it does not itself generate random or sequential telephone numbers to call, because Subway already has a stored list of target telephone numbers. Instead, it uses a random or sequential indexing process to identify which of the numbers from the stored list to call.

Assuming Soliman is right about how Subway's system works, a system that works this way would not violate the Act. That is because when the Act refers to a "random or sequential number generator," it means a generator of random or sequential *telephone* numbers—not a generator of random or sequential *index* numbers that are used in turn to select telephone numbers to dial.

---

[4] *Id.* at 8 (¶ 39).
[5] *Id.* at 8–9 (¶ 41).
[6] *See* Doc. #60 at 9.
[7] *Ibid.*

This conclusion follows from the text of the Act, which defines an automatic telephone dialing system as a device that can "store or produce *telephone numbers* to be called, using a random or sequential *number* generator; and … dial such *numbers*." § 227(a)(1) (emphasis added). The first "numbers" goes with "telephone," and the third "numbers" in context ("dial such numbers") must also refer to "telephone numbers." It would be odd if, sandwiched between those two identical uses of the term "numbers," the term "numbers" appeared a third time with an entirely different meaning—to mean *index* numbers rather than *telephone* numbers.

The rest of § 227 confirms this interpretation. Besides protecting cellphone users, the Act makes it illegal to call "emergency telephone line[s]" with an autodialer or to use an autodialer "in such a way that two or more telephone lines of a multi-line business are engaged simultaneously." § 227(b)(1)(A), (D). As the Supreme Court explained last year, "[t]hese prohibitions target a unique type of telemarketing equipment that risks dialing emergency lines randomly or tying up all the sequentially numbered lines at a single entity." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1171 (2021). If the Act targets devices that call random or sequential *telephone* numbers, then it fits this aim snugly. But if it targets any device that uses sequential or random integers in a programming step to decide which numbers to call from a stored list of target numbers, then it does not fit that aim at all.

Plus, Soliman's reading of the Act would be an unlikely way for Congress to craft a statute. As Soliman admits, a law that covered all uses of random or sequential numbers is tantamount to a ban on *any* program that can call more than one phone number at a time.[8] But if Congress wanted to ban all mass dialing, it would have just said so, not obliquely banned a programming tool used for that.

---

[8] Doc. #60 at 11–12 ("Without [a random or sequential number generator], a dialing campaign would require an agent to manually place the call … [or] some other organic one-to-one triggering event.").

4

And under Soliman's reading, the Act would probably cover much more than mass dialing. As she admits, sequential number generation is "an incredibly common programming tool."[9] Under Soliman's theory, then, the Act would likely cover *every* call placed by a computer or smartphone. But the Supreme Court has already held that it does not. *See Duguid*, 141 S. Ct. at 1171. In all, Soliman's reading would "take a chainsaw to the[ ] nuanced problems [of robocalls] when Congress meant to use a scalpel." *Ibid*.

In response, Soliman relies on a line from *Duguid*. There, the Supreme Court had to decide a different issue and did not expressly consider what the term "numbers" means. But in a footnote, the Court suggested that "an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list." *Id.* at 1172 n.7. Soliman reads this dictum to mean that the Act covers software like Subway's. The footnote, however, is ambiguous: the Court left open whether the telephone numbers on the "preproduced list" were themselves generated randomly or sequentially. If they were, then this example would not help Soliman, because there is no allegation that Subway generated its list of stored numbers that way.

So *Duguid* does not support her argument. To the contrary, "[c]ourts interpreting the TCPA post-*Duguid* have rejected the argument that Plaintiff asserts here—that a device may be deemed an autodialer under the TCPA even if it uses a preprepared list of numbers, so long as the device randomly or sequentially chooses which numbers on that list to contact." *Mina v. Red Robin Int'l, Inc.*, 2022 WL 2105897, at *4 (D. Colo. 2022) (citing cases); *see also In re Portfolio Recovery Assocs., LLC, Tel. Consumer Prot. Act Litig.*, 2021 WL 5203299, at *2–4 (S.D. Cal. 2021) (citing cases).

---

[9] *Id.* at 19.

Besides, the rest of *Duguid* sharply favors Subway. As I have noted, the Supreme Court found the Act to have a purpose that is incompatible with Soliman's overbroad interpretation. And in one part of the opinion, the Court even defined automatic telephone dialing systems as devices that "allow[ ] companies to dial random or sequential blocks of *telephone* numbers." 141 S. Ct. at 1167 (emphasis added).

The TCPA is clear: a device is not an automatic telephone dialing system merely because it generates random or sequential *index* numbers that are used in turn to select which numbers to call from a stored list. The complaint does not allege facts to plausibly suggest that Subway used an "automatic telephone dialing system" within the meaning of the TCPA.

### *Artificial or prerecorded voice*

Next, Soliman argues that the text message violated the Act because it was an "artificial or prerecorded voice." Not so. A "voice" is a "[s]ound formed in or emitted from the human larynx in speaking." *Voice* (def. 1a), *Oxford English Dictionary* (2d ed. 1989). A text message with no audio component does not qualify.

To be sure, as Soliman points out, "voice" can also be used metaphorically, to mean an "[u]tterance or expression." *Ibid.* (def. 1f). But this use is less common and is typically used in poetic or literary settings; the dictionary examples for this sense of the word are "the courage which gave Voice to its creed"; "hero-worship, which found voice in song"; and "the party [that] became the voice of the workers." *Ibid.*; *Voice* (def. 3), *Webster's Ninth New Collegiate Dictionary* (1991). In normal English, an advertiser's text message is not its "voice."

Soliman's interpretation is even less plausible given that the Act bans "*prerecorded* voices." To "record" is "[t]o convert (sound or visual scenes, esp. television pictures) into a

6

permanent form." *Record* (def. 9c), *Oxford English Dictionary*. This definition matches perfectly with the sound sense of "voice," but not with the metaphorical one.

The rest of § 227 confirms that Congress used "voice" the standard way. The Act defines "caller identification information" as "information regarding the origination of[ ] a call made using a voice service or a text message sent using a text messaging service." § 227(e)(8)(A). If a text message were a type of voice call, this definition would be redundant.

Soliman replies that her reading finds support in the Act's purpose and legislative history, and in the FCC regulations implementing the law. She adds that, as a remedial statute, the Act should be interpreted broadly. But arguments like these are on the menu only when a law is ambiguous; "[a]bsent ambiguity," my analysis must "end[ ] with the statutory language." *Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136, 141 (2d Cir. 2013). Here, the Act has only one plausible meaning: text messages without an audio component are not prerecorded voices. Accordingly, Soliman's second theory also fails.

## CONCLUSION

Subway's motion to dismiss is GRANTED. The Clerk of Court shall close this case. Because this ruling turns purely on an issue of statutory interpretation, not a deficiency in the pleadings, amending the complaint would be futile. The complaint is therefore dismissed with prejudice.

It is so ordered.

Dated at New Haven this 18th day of July 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge